

CLERK'S OFFICE
A TRUE COPY
Jun 16, 2020
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Devices A and B, more fully described in Attachment A, and located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin

Case No. 20-M-322 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the __Eastern__ District of __District__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1), 924(a), 924(c) | see Attached Affidavit. |
| 21 U.S.C. § 841(a)(1) | |

The application is based on these facts:
see attached Affidavit.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kathrine L. Kelley, SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: 6-16-20

*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Kathrine L. Kelley, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— two electronic devices —which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent with the FBI and have been since May of 2019. I have been assigned to the Southeastern Wisconsin Regional Gang Task Force since October of 2019. Prior to being employed as a Special Agent with the FBI, I was employed as a Staff Operations Specialist for the FBI for approximately nine years. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. Section 2510(7), in that I am empowered by the law to conduct investigations of and to make arrests for federal felony arrests.

3. As a Special Agent, I have participated in the investigation of narcotics-related offenses, resulting in the seizure of illegal drugs, weapons, United States currency, and other evidence of criminal activity. As a narcotics investigator, I have interviewed individuals involved in drug trafficking and have obtained

1

information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances. I have participated in several aspects of drug investigations, including physical surveillance, execution of search warrants, undercover operations, court-ordered wiretaps, analysis of phone and financial records, and the arrests of numerous drug traffickers. Additionally, I have spoken with other experienced narcotics investigators on numerous occasions concerning the method and practices of drug traffickers and money launderers. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, and distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities. I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such.

4. I have participated in several trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these

2

computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5. The facts in this affidavit come my personal observations, my training and experience, my review of documents, and information obtained from other law enforcement agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**IDENTIFICATION OF THE DEVICES TO BE EXAMINED**

6. The property to be searched is described as follows:

   a. Black Samsung smartphone, hereinafter referred to as "**Device A**";

   b. Black Samsung Galaxy S8 smartphone, hereinafter referred to as "**Device B**";

7. **Devices A** and **B**, collectively the "**Devices**," are currently located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.

8. The applied-for warrant would authorize the forensic examination of the **Devices** for the purpose of identifying electronically stored data more particularly described in Attachment B.

3

## PROBABLE CAUSE

9. On February 4, 2020, at approximately 4:15 p.m., law enforcement officers saw a suspected drug transaction in the Wendy's parking lot, located at 4601 W. North Avenue in Milwaukee, Wisconsin. Specifically, officers conducting surveillance at this location in an undercover capacity observed a volkswaegn Jetta running and parked in the Wendy's parking lot. Officers parked alongside the Jetta and observed an occupant, later determined to be A.B., in the vehicle. A.B. was not eating and did not have a food bag on the front seat of A.B.'s vehicle. Approximately, five minutes later, officers observed a Chevrolet Equinox, bearing Wisconsin registration plate 559-HBV, with excessive window tint, arrive in the Wendy's parking lot and park next to the Jetta. A.B. then exited the Jetta and entered the front passenger door of the Chevrolet. Officers at the scene believed that this transaction was consistent with a drug transaction.

10. At approximately 4:28 p.m., uniformed police officers conducted a traffic stop on the black Chevrolet Equinox for the above-described suspected drug transaction and for the vehicle having illegally tinted windows. The driver was identified as Fabian Johnson, and the passenger was identified as A.B. Upon a search of the vehicle, officers found a jar containing seven baggies of marijuana weighing a total of 22.26 grams and 30 baggies of crack cocaine weighing a total of 1.86 grams, and $40 in two twenty dollar bill denominations in the center console

4

cup holder. **Devices A** and **B** were also found in the center console cup compartment of the vehicle.

11. After being advised of her constitutional rights, A.B. consented to a search of her cellular phone, and officers found text messages between her and phone number (414) 659-7430, listed in A.B.'s contact as "BAC FABIAN," who officers believe to be Fabian Johnson. On February 4, 2020, at 1:06 p.m., Johnson wrote to A.B., "Don't surprise me, just call when you're heading this way." A.B. responded at 3:14 p.m., "If you tell me where to meet you I can put it in my GPS and give you an exact time . . ." At 3:42 p.m., Johnson replied, "Wendys, right off of Lisbon and North Avenue. Right off of the highway." A.B. then texted at 3:44 p.m., "Gps says I be there 4:20." Johnson replied, I only got the $40 kind left."

12. Upon seeing these text messages between "BAC FABIAN" and A.B., officers dialed the phone number (414) 659-7430, and **Device B** began to ring.

13. Johnson was arrested and conveyed to the police station. On the floor of the vehicle near where Johnson was seated in the police vehicle, officers located two small corner cut backs of suspected crack cocaine, totaling 0.39 grams.[1]

14. After Johnson's arrest, officers went to Johnson's residence, located at 2026 N. 39th Street in Milwaukee, Wisconsin and spoke to Ermamarie Jenkins,

---

[1] The crack cocaine found in Johnson's vehicle and the squad vehicle also field tested positive for fentanyl.

5

who lives in the residence with Johnson. Jenkins admitted that she had a firearm in a backpack in her bedroom and a gram of "weed" in the residence. Jenkins refused to give officers consent to search the residence, so officers secured the residence and obtained a search warrant.

15. After obtaining the search warrant, officers asked Jenkins where her firearm was located. Jenkins told the officers that her firearm was located in a backpack in a bedroom she shared with Johnson. Jenkins admitted that she bought a Smith and Wesson .380 caliber firearm two to three years ago at Gander Mountain. Jenkins said that this was the only firearm in the residence and there was a box of ammunition in the dresser.

16. Officers then searched the residence pursuant to the warrant. In the dining room, officers located identifiers for Fabian Johnson and a Smith and Wesson gun box with a receipt for Ermamarie Jenkins.

17. Officers located various items of evidentiary value in the master bedroom. Officers located a loaded Smith and Wesson, model SD40VE, .40 caliber pistol and two extra loaded Smith and Wesson magazines between the mattress and box spring. Within the nightstand on which identifiers for Johnson were located, officers found razor blades, a digital scale, a clear plastic Tupperware container with suspected marijuana residue, a box of sandwich bags on the nightstand, and a box of ammunition containing 23 cartridges. Located on the floor of the bedroom was a clear glass jar containing 11.21 grams of marijuana. Located in one of the

6

dressers, containing male clothing and a white powdery substance that did not test postivie during narcotics testing, was a "skeleton" key that opened the locked closet in the master bedroom. Inside the closet, officers officers found a jar containing 23.45 grams of crack cocaine (packaged within four baggies and one baggie had 37 corner cuts in it) and 3.08 grams of heroin[2] (packaged in two baggies); a jar containing 223.90 grams of marijuana; a jar containing four corner cuts of 17.84 grams of marijuana; a box containing four jars of marijuana weighing a total of 76.82 grams; clothing for Johnson and Jenkins; numerous loaded firearm magazines and multiple rounds of ammunition; and a Smith and Wesson firearm box. Officers located a Smith and Wesson, model Bodyguard, .380 caliber handgun with a loaded magazine in a bag next to another dresser, which contined a box of ammuuntion containing 88 cartridges.

18.     A total amount of 329.77 grams of marijuana, 23.45 grams of crack cocaine, and 3.08 grams of heroin was located within Johnson's residence.

19.     Johnson has prior felony convictions of possession with intent to deliver cocaine and two cases of felon in possession of a firearm.

20.     Affiant knows that Johnson used **Device B** to sell cocaine to A.B. Furthermore, affiant believes that Johnson used his cell phones to facilitate

---

[2] The heroin found in the closet of Johnson's residence also field tested positive for fentanyl.

7

controlled substances transactions, and evidence of drug trafficking may likely be stored and recorded on the **Devices**.

21. Through affiant's training, experience and discussions with other experienced law enforcement officers, affiant is familiar with the ways in which drug traffickers conduct their unlawful trade, including their methods of distribution, their use of communication devices, their use of coded communications to conduct their transactions, the employment of counter surveillance, their use of false or fictitious identities, and their use of various forms of electronic devices to store and/or conceal illegal activity.

22. Based upon my training and experience, affiant knows that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. Affiant has also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.

23. Based on my training and experience, affiant is aware that individuals involved in trafficking controlled substances often possess multiple cellular devices to compartmentalize their illegal activity and to avoid law enforcement detection.

24. Based upon my training and experience, affiant believes it is common for crime suspects who possess illegal controlled substances and firearms to often

8

take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell; furthermore, affiant believes it is common for these photographs and visual depictions to be kept and maintained on their cellular devices.

25. Based upon the facts described above, to include (1) my knowledge of and experience confirming the prolific use of electronic devices to facilitate the possession and trafficking of controlled substances and firearms; (2) that controlled substances were located in Johnson's vehicle and residence and a loaded pistol, magazines, and drug paraphernalia were found in Johnson's residence; (3) Johnson used **Device B** to conduct a drug transaction with A.B.; and (4) Johnson's status as a convicted felon, there is probable cause to believe that a search of the information contained within the above described **Devices** will produce evidence of a crime, namely evidence related to the possession of firearms and possession and trafficking of controlled substances.

26. **Devices A** and **B** were seized by the Milwaukee Police Department Officers during a search of Johnson's vehicle.

27. The **Devices** are currently in storage at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin. In my training and experience, I know that the **Devices** have been stored in a manner in which their contents are, to the extent material to

9

this investigation, in substantially the same state as it was when the **Devices** first came into the possession of the Milwaukee Police Department.

## III. TECHNICAL TERMS

28. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

10

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run

computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

29. Based on my training, experience, and research, I know that the **Devices** have the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA, and all

12

have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

## IV.     ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

31.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Devices** because:

- i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

- j. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

- k. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper

13

context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

32. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **Devices** to human inspection in order to determine whether it is evidence described by the warrant.

33. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Devices** described in Attachment A to seek the items described in Attachment B.

15

# ATTACHMENT A

1. The property to be searched is described as follows:

    a. Black Samsung smartphone, hereinafter referred to as "**Device A**" and

    b. Black Samsung Galaxy S8 smartphone, hereinafter referred to as "**Device B**."

2. **Devices A** and **B**, collectively the "**Devices**," are currently located at 2620 West Wisconsin Avenue, Milwaukee, Wisconsin.

This warrant authorizes the forensic examination of the **Devices** for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the **Devices** described in Attachment A that relate to violations of Title 18, United States Code, Sections 922(g)(1), 924(a), 924(c); and Title 21, United States Code, Section 841(a)(1), and involve Fabian Johnson, including, but not limited to:

   a. lists of customers and related identifying information;

   b. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   c. any information related to sources of firearms and drugs and co-conspirators (including names, addresses, phone numbers, or any other identifying information);

   d. any information recording schedule or travel;

   e. all bank records, checks, credit card bills, account information, and other financial records;

   f. Photographs and/or videos depicting possesson of drugs or firearms;

   g. Any evidence related to either the ownership, purchase, or possession of drugs or firearms; and

   h. Records of Internet activity, including browser history, search terms that the user entered into any Internet search engine, and records of user-typed web addresses

2. Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

1

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.